ORANGE SWAN v. W. B. CASTLEMAN, et. als.

1. DEMURRER. *What it admits.* A demurrer admits all matters well pleaded, with certain limitations, such as statements contradicted by other parts of the bill, as an exhibit made part of it.

2. PLEADING. *Construction.* The original bill alleged that defendant and his mother took a lease of the property in controversy. The lease was not made an exhibit to the bill, but a copy from the Register's office was offered to be produced at the hearing as evidence. The cross-bill admitted the copy was on file at the time of filing the cross-bill, and admitted that his mother did take the lease. Upon demurrer to the cross-bill,

*Held,* That the lease might be looked to as part of the cross-bill, as though it had been made an exhibit thereto.

17—VOL. 4.

3. LEASE. *Construction.* Winnie McFarland owned a dower interest in sixty-three feet of ground, on which she resided. The legal title to the remainder interest in said sixty-three feet, as well as to three additional feet not included in the dower, was in complainant and his wife. This being the state of facts, Winnie McFarland and her son, W. R. McFarland, took from complainant and wife a lease in these words; "Rent all the ground now owned by Swan (the complainant) and wife on Lot No. 36, in the city of Nashville, on College Street, which lease shall continue during the life of said Winnie McFarland, paying ten cents per annum and taxes on said land, etc."

*Held,* That the lease, construed in connection with the allegations of the bill, does not include the sixty-three feet of dower, and that defendant is not estopped thereby to dispute complainant's title to the land covered by the dower.

4. FRAUDULENT DEED. *By whom may it be impeached.* A deed obtained by fraud or duress is not absolutely void in law, so as to be incapable of confirmation, but is voidable at the election of the party defrauded or coerced. Such deeds, however, are only voidable and to be avoided at the election of the *party defrauded or coerced,* and by privies, and no third person can interpose to assert his right for him.

5. POSSESSION. *Rights under.* One in possession of property, claiming it as his own, is entitled to retain his possession as against all but one having a superior right.

6. FRAUD. *How third party may take advantage of.* Though a conveyance obtained by fraud be only voidable, and can be impeached and set aside only at the suit of the party defrauded, or his privies, yet, if the property conveyed is in the possession of a third party, and the fraudulent conveyee has to come into a Court of Equity for assistance in the assertion of his claim, and to obtain the benefit of his fraud, he will be repelled upon the maxim that "he who comes into that Court asking its aid must do so with clean hands." This is not to give active relief to a party who has no title, but is simply a principle on which his opponent is repelled from the Court, the Court helping neither the one nor the other—not the complainant, because it would be helping him reap the benefit of his fraud; nor the defendant, because he might have no legal title, yet, being defendant, and in possession, his condition is best.

Cases cited: Waterhouse's Lessee *v.* White, 2 Tenn. R., 333; Marr *v.* Gilliam, 1 Cold., 507–8; Mallory, Adm'r, *v.* Young, 10 Hum., 300; Parks, for use, etc., *v.* McKamy, 3 Head, 297.

Swan v. Castleman.

Authorities cited: Bispham's Prin. of Equity, p. 205, §42; Kerr on Frauds, pages 48, 49, 50; Story Eq. Jur., Redf. Ed., §257a; Gale v. Lendo, 1 Vernon, 475; Jackson v. Marshall, 1 Murphy, N. C. R., 332.

FROM DAVIDSON.

Appeal from the Chancery Court. DAVID CAMP-BELL, Chancellor.

JORDAN STOKES for Orange Swan.

No brief for Castleman.

FREEMAN, J., delivered the opinion of the Court.

By the original bill in this case it is stated, that Robert P. McFarland died in the city of Nashville in 1821; that he was owner, by descent from his father, of lot No. 36, as laid down on the original plan of said city, two parcels of thirty feet each, front-ing on College Street, running back the depth of the lot, except ten feet for a passway, however, having been sold off by him before his death. He left his widow, Winnie McFarland, and one daughter, Sarah J. McFarland, his only heir. The widow administered on his estate, and had dower assigned her, which was about sixty-three feet of the lot fronting on College Street. The bill states, that she remained in possession and enjoyment of her dower until her death, in May, 1863. After the dower was allotted, there was, on the north side of it, about ninety-five

feet fronting College Street, and on the south about thirty-two feet, which had descended to the daughter.

In 1836, this daughter married the complainant in the original bill, and in 1842 he and his wife sold all the lot, including the remainder in the dower interest, then occupied by the widow, to one Isaac C. Benson. On the 26th of August, 1842, it appears Benson professed to sell this lot back, and did convey it to Swan and wife. Swan and wife, afterwards, in 1848, sold sixty feet of this lot to one Simpkins, and in 1850, thirty feet more. They also sold thirty-one feet, in 1850, to one Morrison. These sales left the dower interest of sixty-three feet, with five feet on the north, as stated in the bill, in the answer and cross-bill three feet, and one foot on the south.

It is then alleged, that in 1857, Winnie McFarland, and defendant, Wm. R. McFarland, an illigitimate son of Winnie McFarland, who was living with his mother at the time, leased from complainants all of said property not previously sold, at a rent of ten cents a year, and payment of taxes, with a stipulation to restore the property to the possession of Orange Swan at the death of Winnie McFarland.

After this introductory matter, not apparently much related to what would seem the main purpose of the bill, it is then alleged, that in 1858 complainant and wife sold and conveyed all this property to Curtis F. Swan for $13,600, for which his note was taken twelve months after date. Curtis F., on the same day, made a deed of trust to defendant Castleman, as trustee, to

secure the payment of this note. Castleman refused to accept the trust, and this bill asks a sale of the property under the deed of trust, for the payment of the debt secured by it.

In addition, it is claimed, that Curtis F. Swan (who is a non-resident) owes complainant another note, of upwards of $5,000, given in July, 1855; that McFarland has remained in possession of the lot since the death of his mother, Winnie; has rented a portion of the premises, and received rents; and that he had remained in possession in violation of the lease, without color or pretence of title. This bill was filed in 1866.

The prayer of the bill was for sale of the property to pay the debt secured, for an attachment of the rents due from W. R. McFarland to Curtis F. Swan, to be appropriated to the payment of the debt. It is proper to state that Sarah, the wife of complainant, had died before the filing of this bill, never having had any child.

The answer, which is filed as a cross-bill, admits most of the statements of the original bill, and that the mother had taken the lease exhibited with the bill. It then puts in pretty distinctly three or four grounds of defence against complainant's claim, which may be summed up as follows:

First, that the lease did not embrace or have anything to do with the dower interest, nor cover it, but only extended to about three feet on the north of the dower, the only object in taking it being to enable

respondent and his mother to close up this three feet which was being used as a passway, to the annoyance of those occupying the dower premises.

Second, that the deeds made by the wife of Swan to Benson, and then by them, after the reconveyance, to Curtis F. Swan, were obtained from the wife by fraud, coercion, and undue influence. That they were a part of a meditated scheme of fraud or malpractice by which the husband, Orange Swan, was to secure the title to the property of his wife, she being childless and in feeble health. In support of this view, it is alleged that Curtis F. Swan is a nephew of complainants, was totally insolvent at the time of the pretented sale to him, and that the same was not *bona fide*, but only a part of the fraudulent arrangement. He also suggests that the $5,000 debt claimed is fictitious and not real.

Third, respondent claims that he is not a trespasser or wrongdoer in holding possession of the property, or remaining on it, and asserting title to it, because he insists, that though he is illegitimate, he is the heir of his mother, and as such entitled to the property by descent. The prayer of this answer as a cross-bill is simply that the same be answered, these defences be allowed to the original bill, the same be dismissed, and for general relief in the usual form.

A demurrer was filed to this cross-bill, which, so far as it is special, and points out defects in the cross-bill, we will state. The second assignment is substantially, that before the filing of the original bill, res-

pondent in the cross-bill was a mere tenant, had gone into possession of it under a written lease from complainant and wife, and was thereby estopped to deny or set up any defect in complainant's title, or resist his equities.

The third assignment is, that McFarland, being illegitimate, had no right or interest in the property as heir of his mother, and not entitled to resist the claim of complainant on the grounds set forth in the crossbill.

The fourth assignment is, that even though McFarland was in adverse possession of the property from the death of his mother, such possession would not entitle him to resist complainant's claim, nor to any discovery on the matters alleged.

The demurrer was overruled, and an appeal allowed to this Court.

The first question presented is, that defendant was a tenant of complainant under a lease from him and wife, and estopped to deny the title of complainant.

The original bill does allege that defendant and his mother took a lease of all the property not previously sold. This lease is not made an exhibit to the bill, but a copy from the Register's office is offered to be produced, on or before the hearing, as evidence. The cross-bill, however, says it was on file in the cause at that time, and admits that his mother did take the lease, but claims and avers this lease had nothing to do with the dower property, and only extended to about three feet in the north of the dower.

The demurrer admits all matters well pleaded, with certain limitations, such as statements contradicted by other parts of the bill—as an exhibit made part of it. We take it, the fair meaning of the statements made in the cross-bill is, that the lease on file was taken, but that it does not cover or include the dower property. We must look to the paper, in connection with the allegations of the bill sustaining it, to see whether it does include this property, so as to raise the relation of landlord and tenant, and create the estoppel. It purports on its face to be an agreement for a lease between O. Swan and defendant W. R. McFarland and Winnie McFarland, to " rent all the ground now owned by said Swan and wife on Lot No. 36, in the city of . Nashville, on College Street, which lease shall continue during the life of said Winnie McFarland," paying ten cents per annum and taxes on said land, together with damages that may accrue by reason of the taxes not being paid. Now the allegation is, that this did not include the dower interest on which Winnie McFarland lived, and on which she was entitled to remain until her death—the time fixed for the termination of the lease—and reasons are given in support of this view. The only question is, does the language of the lease contradict the allegations. We think not. On the contrary, construed in the light of the facts stated, the amount of rent, together with the absurdity of a life tenant taking a lease for life of property of which such tenant is possessed, and entitled to hold for life, we have no

hesitancy in saying the lease did not cover nor include the dower interest, nor estop the parties from asserting any title they may have to the same. The demurrer was properly overruled as to this objection, and complainant can take no benefit from the relation of landlord and tenant, as against the defendant.

We need not comment on the case cited by counsel, where a party obtained the privilege of entry on property to gather vegetables, and availed himself of the privilege to take possession of a house on the property, where it was properly held he was estopped by his contract to resist the right of the party who had granted the privilege to eject him from the house. In that case an entry on the property was obtained by the contract. Here, as to the dower property, the parties were in possession, and did not go in under the lease at all.

The next question presented is, whether McFarland, under the allegations of the cross-bill, being an illegitimate child of Winnie McFarland, is entitled to resist the claim in the original bill, on the facts stated in the cross-bill or answer, or to any discovery in aid of his defence. The question argued most ingeniously before us is whether a party in possession, claiming for himself, though in fact having no valid title, on the assumption that he could not inherit from his mother as an illegitimate, can set up defects in the title of complainants, show his deeds were fraudulently obtained as to the rights of others, the real heirs in this case, and thus retain his possession, or can he

show an outstanding title by the reasons attempted in this case.

The grounds on which the deed from Benson to Swan and wife, and from Swan and wife to Curtis F. Swan, are sought to be attacked are that they were obtained by fraud, coercion, and undue influence on the part of complainant, and, taking all the statements of the bill, were a part of a meditated scheme of fraud by which Swan sought to obtain the title to the property, and defeat the rights of the heirs of his wife at her death. It may be assumed as settled law, that a deed obtained by any of the means mentioned would not be absolutely void in law, so as to be incapable of confirmation, but would certainly be voidable at the election of the party defrauded or coerced, and by privies. That such deeds are only voidable, and to be avoided by the party coerced or defrauded, or those representing him, is involved in the settled principle of law, that the party may confirm such deeds, and may refuse to assert his right, may acquiesce in the wrong done him, and no one can interpose to assert his right for him.

A late writer—Bispham's Principles of Equity, page 205—has stated the principle, we think, accurately on this subject. After stating the rule we have laid down, that the instrument is not absolutely void, but only voidable at the election of the injured party, he says: "There is, indeed, a distinction between deeds and other instruments which a man intends to execute, though his intention may be brought about by fraudu-

Swan *v.* Castleman.

lent means, and those which he has no intention to execute, but execute under the impression that the instrument is of a different character from what it actually is. In the latter case, the instrument is absolutely void, and the law above stated in relation to voidable instruments would not apply." §202. See, also, Kerr on Frauds, pages 48, 49, 50, and cases cited in complainant's brief.

And so we think a forged deed would pass no title to the party obtaining it, or party to it, or claiming to recover immediately on such deed. Whether the case of *Waterhouse's Lessee* v. *White*, 2 Tenn. R., 333, is decided correctly or not on the question of allowing a naked intruder to show a remote *mesne* conveyance, which had been regularly proved and registered, to have been a forgery, we do not decide. It is evident the principle of that decision can only be sustained by confining it to the precise case in judgment.

These principles being settled, we think it clear that defendant McFarland, on the assumption that he had no title to the property as heir of his mother, (who was the heir of Sarah McFarland,) could not be permitted to come into a Court of Equity and ask to have the deeds mentioned declared void. Winnie McFarland, in her life-time, or her heir on whom the estate was cast by law, clearly might do so, but no stranger could. We do not at present, however, decide the question as to the right of McFarland to inherit from his mother.

It is clear, however, that McFarland is in .possession of the property, claiming it as his own. That as against all but one having a superior right, he is entitled to retain his possession. This possession is a substantial legal right, under the case of *Marr* v. *Gilliam,* 1 Cold., 507–8. This bill is not an eject-ment bill, or one to remove a cloud from a superior title, but as against McFarland, possession is but asked incidentally, by way of making sale of the property under the deed of trust. The rents are attached in his hands on the assumption that they belong to Cur-tis F. Swan, who in equity would be the owner of the land, though conveyed by deed of trust or mort-gage to secure the payment of the purchase money. If, on the facts assumed in the cross-bill, a Court of Equity would not actively enforce this deed of trust, or the conveyance from Swan and wife to Curtis F., then McFarland, it would seem, is entitled to the dis-covery, by way of defence, against complainant's as-sumed right to deprive him of the possession, and to be substituted to the rights of Curtis F., as to the rents, and have them appropriated to the payment of his debt of $5,000. In this view, the question is not of active relief to be given to McFarland by declar-ing the deeds void, but is of the right to discovery of facts that will enable him to resist complainant's claim to oust him of his possession, and treat him as a trespasser, owing Curtis F. Swan for the use and oc-cupation of the property. Let us look at the ques-tion in this aspect.

It is a maxim of a Court of Equity, that he who comes into that Court, asking its aid, must do so with clean hands. Bispham's Pr. of Eq., §42. "Thus," says this author, "a party who seeks to set aside a transaction on the ground of fraud, must himself be free from any participation in the fraud if he desires any relief from a Court of Equity. Of course, he adds, this only applies to the particular transaction under consideration, for the Court will not go outside of the case for the purpose of examining the conduct of the complainant in other matters, or questioning his general character for fair dealing."

Mr. Story's Eq. Jur., Redf. Ed., §257a, gives the principal thus: "In general, a contract which contemplates a fraud upon third parties is regarded as so far illegal between the immediate parties that neither will be entitled to claim the aid of a Court of Equity in its enforcement." So in our own State, a party who had delivered a note to a third party, with a view of defrauding his wife of almony, was repelled from a Court of Equity, so that his administrator could not recover the note again, in pursuance of an agreement with his intestate that it should be redelivered or accounted for. The Court saying, as between the parties, they would not take cognizance of such fraudulent transactions. *Mallory, Adm'r,* v. *Young,* 10 Hum., 300.

In the case of *Parks, for use, etc.,* v. *McKamy,* 3 Head, in an action at law on a note given for property, which pretended sale was made to hinder and delay

creditors, the payee of the note was not allowed to recover, on the ground that an action will not lie to enforce a contract in violation of law, immoral, or contrary to public policy. In these cases the defendant was participant in the fraud, but as defendant in the last case, he was held entitled to repel the plaintiff, not because of any favor shown him, but simply because he is such defendant. The Court say: "This does not impair the rule, that the parties to a conveyance to defraud creditors are bound by it, since neither can invoke the aid of a Court to undo it." In fact, this is the true principle of the rule.

It is true, these cases and others that might be cited, are between the immediate parties to the fraudulent contract, where one seeks to enforce it against the other. But the principle on which they rest is the enforcement of a sound legal morality, not that the defendant has any valid claim or title, but that complainant asks aid to enforce an iniquitous transaction. Nor can we see why a party should be repelled as against another who is equally participant in the wrong, and at the same time be allowed to enforce through a Court of Equity an iniquitous contract, receiving its active aid, as against a party in possession of property, claiming it, however, by a defective title, yet who is free from all fraud or participation in the fraudulent transaction sought to be enforced. May not such a party well ask the Court to stay its hand and repel a party from enforcing against him a claim conceived in fraud as to the rights of third

parties, and thus say to the party, you can reap no advantage by your fraud or iniquity by the aid of a Court of Equity.    Is not this a fair application of the maxim that "he who does iniquity shall not have equity," that is, shall not have the aid of a Court of Equity in making his iniquity effectual.

This is not to give active relief to a party who has no title, but is simply a principle on which his opponent is repelled from the Court, the Court helping neither the one nor the other—not the complainant, because it would be to aid him in reaping the benefit of his fraud; nor the defendant, because he might have no legal title, yet, being defendant, and in possession, having a possessory right, his condition is best, and the Court, as against his opponent, will leave him his advantage.

If these principles and reasonings be sound, then complainant in the cross-bill would be entitled to a discovery from the complainant in the original bill as to the alleged fraud, duress, and coercion in obtaining the deeds, and in the sale and conveyance to Curtis F. Swan, in order to show that all these transactions are, as alleged, a part of a meditated scheme of fraud carried on between these parties to defeat the rights of the heirs of Sarah McFarland, afterwards Mrs. Swan, and as such not absolutely void, or even voidable, at the suit of defendant, but so tainted by the fraud, so grossly wrong and immoral as to repel the party from a Court of Equity, and make it proper for the Court to refuse him any assistance whatever in carrying out his scheme.    If

the facts alleged can be made out by proof, then complainant does not come into Court with clean hands, but with hands stained all over by fraud and iniquity; and that in the very transaction sought to be enforced by the aid of the Court, to-wit: the sale to Curtis F., and the deed of trust sought to be enforced, as well as the other deeds making up his title, as he alleges it.

This holding in no wise infringes on the doctrine, that even a fraudulent sale is valid as between the parties in the lease.

This rule is stated by Judge McKinney, in the case in 3 Head. It only leaves the party where he has placed himself by his own conduct, if the facts alleged be true, and refuses to aid him in ousting one in possession under a claim of title, refusing to actively enforce an apparent iniquitous claim of title as against such possessor, or to assist a party in carrying out a scheme of fraud upon the rights of others. See also *Gale* v. *Lendo*, 1 Vernon, 475, cited in *Jackson* v. *Marshall*, 1 Murphy, N. C. R., 332.

This view of the case renders it unnecessary, at present, to discuss or decide the question of the rights of an illegitimate child, claiming to be heir of his mother, under the circumstances presented in this case, and we waive that question. The result is, that the demurrer is overruled, affirming the decree of the Chancellor for the reasons given, and remanding the case for further proceedings.