MAMIE FLY v. EUGENE WOODS, SR., et al.

Western Section.   March 13, 1931.

Petition for Certiorari denied by Supreme Court, July 1, 1931.

W. C. Rodgers, of Memphis, for appellee.

Ben C. Welch, Canada, Williams & Russell, and G. E. Patterson, all of Memphis, for appellants.

OWEN, J.   The defendants have appealed from a decree, sustaining complainant's bill. The bill in this cause was filed March 4, 1929.

The complainant was a married woman. She was formerly Mamie King. She had been married to one King, but had procured a divorce. The defendants are Eugene Woods, Sr., and G. E. Patterson, Trustee, residents of Shelby County, and W. H. Cocke, a resident of Fayette County.

During the pendency of the suit W. T. Haynie appeared and filed his answer. The bill sought to set aside and cancel as clouds on her title to certain real estate a trust deed given to secure four notes of $1,000 each, payable annually one, two, three and four years after date, respectively, and dated August 30, 1922, on the ground that they had been obtained by the fraudulent acts of the defendant, Eugene Woods, Sr., and his attorney, the late Percy Biggs of the Memphis Bar.

The deed of trust having been foreclosed and a trustee's deed executed to W. H. Cocke as the purchaser at said foreclosure sale, he was made a party, and a cancellation of said trustee's deed was also sought upon the same grounds.

Complainant averred that her name was formerly Mamie King, and that on August 26, 1922, she purchased the property involved for the sum of $4,000 in cash and exhibited her original deed as evidence thereof, and that, at the time of the transaction, Mr. W. Percy Biggs, an attorney, represented her, and that a gross fraud was practiced upon her by her said attorney and defendant Eugene Woods, Sr., in that, notwithstanding the fact that the full purchase price of said property was paid in cash, as shown by said deed Exhibit "A" to the original bill, that her said attorney, Percy Biggs, and the defendant Woods procured from complainant, without her knowledge or consent, four notes of $1,000 each and the trust deed securing the same, and that subsequently there had been a foreclosure of said deed of trust.

The answer of the defendants was called for under oath, with the result that defendant Eugene Woods answered denying any knowledge of the execution of said notes or deed of trust or that he had any interest in the same, or any interest in the property.

Defendant W. H. Cocke answered disclaiming any interest in the property under the trustee's deed, but asserting the fact that he purchased the property at a foreclosure sale for his friend, W. T. Haynie, the owner and holder of the aforesaid notes.

The said W. T. Haynie, who, at the beginning, was not made a defendant to the bill, entered his appearance and was, by consent of all the parties, made a defendant and treated as such, and filed an answer asserting that he had advanced to the complainant said sum of $4,000, the purchase price of said property; that she had

executed the notes in question and the trust deed on the property to secure the payment of the same; that he was and had been at all times the bona fide owner and holder of said notes and deed of trust; that the complainant had defaulted; that a proper foreclosure had been had; and that defendant W. H. Cocke had purchased the property at a foreclosure sale for him, and was holding title for his benefit; and that the entire transaction, from beginning to end, was, as to him in good faith, legal and proper.

The complainant gave her deposition. She was recalled for a rebuttal deposition. The defendant W. T. Haynie testified. A number of exhibits were introduced and are found in the record in their regular form, consisting of the deed to complainant, the trust deed she executed. The day she received the deed four notes of $1,000 each, executed by complainant, payable to the order of "myself," a check for $4,000, drawn August 29, 1922 by the Bank of Millington, on the Bank of Commerce of Memphis, and payable to the order of W. T. Haynie. The deed, trust deed and notes all bear date of August 30, 1922.

The witness Mrs. J. H. Mabry knew nothing of the execution of the deed, trust deed and notes. She and the complainant had lived in the same apartment, and this witness testified that Eugene Woods, Sr., often came to see complainant, took her out riding, and that very shortly before complainant moved to the house involved in this controversy, on the corner of Jackson Avenue and Hawthorne Street, Woods made one of his visits to the complainant, and the complainant was so rejoiced that she had received the house and lot, that she met Woods crying, and he asked her, "what was the matter with her," she said, "she was so full of joy," and he said, "well if you are going to cry I will take it away from you, in a joking manner."

The Chancellor, upon final hearing, granted the complainant the relief prayed for and found the following facts, which are set out in a memorandum in the Transcript, and are as follows:

"The complainant's charges of fraud and conspiracy on the part of Percy Biggs, who was a lawyer in good standing at this bar, are not sustained by the proof; it was not necessary to complainant's case to make any such charges against her attorney, and the charges should not have been made in a suit in which his Administrator or heirs were not made parties, and in which no relief was sought against his estate, and this is especially true when there was no real effort to sustain the charge.

"The defendant Woods having disclaimed all interest in the notes, trust deed and property has no interest in the litigation and a decree may be entered as against him.

"The claim of the defendant Haynie that he loaned to the complainant the $4,000 for the purchase of the property; and that he has at all times since the purchase been the owner and holder of the four notes of $1,000 each secured by the trust deed, is palpably false and unreasonable. The notes so far as he is concerned were without consideration; and he derived no interest in the property under the foreclosure sale.

"The defendant Cocke who disclaims any personal interest in the property or the notes derived no interest under the foreclosure sale, either for himself or his friend Haynie.

"A decree may therefore be entered in favor of the complainant, cancelling the notes, trust deed and trustee's deed as clouds upon her title to the property described in the bill.

"Defendant Haynie will be taxed with the costs."

The defendants have appealed and have assigned eight errors. These errors raise four propositions:

(1) The Chancellor erred in sustaining complainant's bill and in cancelling the trust deed and notes, because the Chancellor has granted the relief prayed for against the weight and preponderance of the evidence.

(2) Because complainant came into Court with unclean hands and was permitted to recover compensation for her admittedly immoral conduct.

(3) The Chancellor having found that W. Percy Biggs was not guilty of any fraud, complainant's bill should have been dismissed because relief sought was predicated solely and entirely upon the alleged fraudulent conduct of said W. P. Biggs.

(4) The fourth proposition is raised by the eighth assignment, which is as follows:

The Chancellor erred in not dismissing the complainant's bill for the reason that it developed from complainant's proof that her suit was not to cancel the notes and deed of trust in question because of fraud in their procurement from her, but to enforce an alleged executory promise on the part of Eugene Woods, Sr., to make a gift to her of the property in question, and which alleged promise, being without consideration, was nudum pactum and therefore void.

The complainant testified that she went to the office of W. P. Biggs, a well known and honorable attorney of the Memphis bar, on August 30, 1922, that the night before she went to this attorney's office, the defendant Eugene Woods had told her to meet him at Mr. Biggs' office the next morning, which would be August 30th at 11 o'clock and execute the deed, that she went to Biggs' office, and that when she arrived Mr. Woods was not there, but Mr. Haynie

was there and said "that Mr. Woods was coming to this office, he could not get down and he sent me in his place, and I am in a great big hurry to get back to the office, and if you will do so, just sign this right here, and I will be through and I can go, I have got to hurry and get through with this," and I signed what was supposed to be the deed.

"Q. You have no recollection of signing the four notes at all? A. I don't remember signing that many papers.

"Q. Your recollection is signing one paper, which you thought was deeding to yourself the property? A. Yes."

Complainant testified that W. P. Biggs was her lawyer, that she relied upon him to look after her interests, and that the sale from William Deeker to her was for $4000.

It appears that complainant had sworn in her bill that she had never executed any notes or deed of trust; also upon cross-examination she was ask to sign her name several times so that her signatures could be compared with the signatures on the notes and deed of trust. On this line we find that complainant testified as follows:

"Q. Would you mind taking a pen and ink and just signing your name for me two or three times. A. Mr. Rodgers: Now wait just a minute. Are you going to use that on those notes?

"Mr. Canada: I wanted to ask her to do that.

"Mr. Rodgers: If you are pulling her notes now, I am not going to let her swear to any falsehood about this. She is going to tell the truth about this all the way from beginning to end.

"The Witness: Yes, sir.

"Mr. Canada: Are you getting all this, Mr. Stenographer?

"The Witness: I certainly am. The truth does not hurt anybody.

"Mr. Canada: Mr. Rodgers, I am representing the other side, and I am cross examining your witness.

"Mr. Rodgers: All right, sign your name for him Mrs. Fly. A. Do you want me to sign it as it is now?

"Q135. Both. Suppose you sign it about three times as it is now and then about three times as it was before. A. Oh, for goodness sake. This writing is terrible. I did think I could write better than that.

"Q136. I will ask you to make this Exhibit "A" to your deposition? A. All right.

"Q137. You did sign some notes in Mr. Biggs' office, didn't you? A. I didn't know that I signed any notes. I signed something that I thought was the deed. They told me I would

have to sign the deed, and I signed something. I didn't know that I signed any notes."

"Q144. I show you four notes, all four dated August 30, 1922, for $1,000 each, payable one, two, three and four years after date respectively. I ask you to examine them and state if that is your signature to those notes. A. (Examine notes). That looks very much like it.

"Q145. Will you deny that it is your signature? A. No, I would not deny it. It looks very much like it.

"Q146. Well, it is your signature? A. Well, it may be. I cannot say that it is not, but I don't remember signing them.

"Q147. Well, that is your signature, isn't it? A. Well, I won't say that it is not. It looks very much like it.

"Q148. To the best of your knowledge and information and belief, it is your signature? A. Well, I can't say that, because I don't remember signing that many papers, but it does look very much like my signature.

"Q149. Well, you don't deny that it is your signature? A. No, I won't.

"Q150. Mr. Rodgers: She says she does not know.

"Mr. Canada: Pardon me, the witness is testifying.

"Mr. Rodgers: She has said it looks like it.

"Mr. Canada: Well, it is admitted then that that is her signature?

"Mr. Rodgers: No, she admits it looks very much like her signature.

"Mr. Canada: Do you admit of record that it is her signature?

"Mr. Rodgers: No, I will not.

"Mr. Canada: Then will you kindly permit me to examine the witness?

"Mr. Rodgers: I will, I do not see any use repeating questions.

"Mr. Canada: I beg your pardon.

"Q150. I want to know whether you will flatfootedly deny that is your signature, or whether you will frankly admit it is your signature? A. No, I don't do either one. It looks very much like my signature, but I don't remember signing that many papers.

"Q152. The examination of the witness is resumed. I now show you what purports to be a trust deed, of date the 30th day of August, 1922, purporting to be signed by Mrs. Mamie King, and ask you to examine that signature and state whether or not that is your signature? A. That looks just like the others.

"Q153. You don't deny that it is your signature? A. No, I can't deny it. It might be.

"Q154. But your position is—. A. I know I signed something. I know that. What it was I don't know.

"Q155. Well, why did you sign this something? A. I was supposed to have been signing the deed.

"Q156. Signing the deed to what? A. Signing the deed to my property.

"Q157. Well, you understood you were buying the property? A. I did.

"Q158. Well, you mean you were to sign your own deed to the property? A. How was I to know? I had never bought any property. I never had any business dealings in my life of any kind. I knew nothing whatsoever about drawing them. I trusted them.

"Q159. Who was present when the deal was closed? A. There was not any one present but a Mr. Haynie. There was not another soul there.

"Q160. And Mr. Biggs? A. Mr. Biggs, yes.

"Q161. Yourself, Mr. Haynie, and Mr. Biggs? A. Yes.

The complainant insists that she had no notice of any trust deed being executed, or that any one was claiming that she owed anything on her real estate. The record, however, shows that Deam Adams, real estate dealer in Memphis, wrote several letters to the complainant during the month of September, 1928, and in the letter of September 10, 1928, he called complainant's attention that on August 30, 1922, the records of Shelby show that Mamie King, a widow, gave a mortgage, which is recorded in Book 856 at page 257 to F. S. Toombs and G. E. Patterson securing four notes, each for the sum of $1,000 and due on August 30, 1923, 1924, 1925 and 1926. Mr. Adams further stated in his letter that the total amount of this indebtedness today, if nothing has been paid on it would be $5,512. The letter stated that the writer had discussed the question of this debt with my purchaser and find that he is willing to assume the debt and pay you $1,000 in cash for your equity. He advised the complainant to accept this offer. On September 20th, Mr. Adams wrote to the complainant telling her that the mortgage on her property was about to be foreclosed. In fact the holder of the notes had asked Mr. Adams to foreclose the trust deed, that he had advised the holder to secure a lawyer. In this letter, Mr. Adams advised the complainant that it would be wise for her to accept the offer that was made whereby the purchaser assumes the mortgage and the taxes and pays you $1,000 cash. The letter further recited that he did not want the complainant to get the impression that the

writer was telling about this foreclosure proceeding for the purpose of inducing her to accept the offer. Neither was the writer seeking to influence the owner of the notes to foreclose. The letter requested that the complainant would call at the writer's office the next morning.

On September 27, 1928, Dean Adams procured one W. H. Cocke to execute a contract to purchase the lot in controversy for $7,250 cash. The complainant refused to carry out Mr. Adams' negotiations.

We find as a fact that on the day complainant received the deed from William Deeker, in the office of W. P. Biggs, she executed a trust deed on the same property deeded to her, to F. S. Toombs and G. E. Patterson, Trustees, and said trust deed was for the purpose of securing the following indebtedness, to-wit; four notes of $1,000 each, dated August 30, 1922, and due and payable in one, two, three and four years respectively; said notes bearing interest at 6%, and are signed by Mamie King, payable to her order and endorsed by her. The complainant acknowledged this trust deed before W. P. Biggs, a Notary Public, the date of its execution, and it was filed and registered on October 6, 1922.

Defendant Haynie testified that he borrowed $4,000 from the bank of Millington for the purpose of making a loan to the complainant, that defendant Eugene Woods endorsed Hayie's note on which the $4,000 was borrowed. The Bank of Millington issued, on August 29th, its check to W. T. Haynie for $4,000, which check was drawn on the Bank of Commerce, Memphis, Tennessee. Haynie testified that he endorsed this check in the bank on which it was drawn, that one of the bank officials, Mr. Jas. Money Vardaman was a personal acquaintance and friend of the defendant, and Mr. Vardaman ok'd the check; the check bears in pencil "ok'd J. M. V." Haynie testified that he had the check cashed on the morning of August 30th and took the money realized on the check to Attorney Biggs' office, and this sum of $4,000 was paid over to Attorney Biggs, who received it for the grantor William Deeker, and Deeker was represented by a relative who received the money.

It was earnestly insisted, at the bar, that the check cashed by Haynie contradicted Haynie's testimony in the fact that the check was perforated, paid August 31, 1922, and that this check for $4,000 introduced by Haynie, represented some other transaction other than the real estate transaction involved. While the check for $4,000 was perforated August 31, 1922, it bears the stamp of teller No. 1 of said Bank of Commerce & Trust Company, that it was paid August 30, 1922. It is apparent from the evidence shown on this check that it was paid August 30, 1922 and was perforated

the next day, so there is nothing in the contention that Haynie falsified when he testified that he received the money on August 30th. We find as a fact that he did receive $4,000 from the Bank of Commerce & Trust Company on August 30, 1922, which money was paid in consideration of the house and lot deeded to the complainant. We further find as a fact that the defendant W. T. Haynie was a close associate and friend of Eugene Woods, Sr., a valued employee of the Woods Lumber Company, which appears to be dominated and controlled by the defendant Eugene Woods, Sr. Haynie had been in the employ of the Woods Lumber Company for about twenty years.

It is complainant's insistence that the defendant Woods gave her the $4,000 for love and affection, that Woods had been coming to see her, making calls, taking her out riding, but she and Woods had not sustained any illicit relations until after she had received the $4,000, or the property purchased with the $4,000. She knew that Woods was a married man; complainant had been married, but had secured a divorce from her first husband, and that she had been paid $2,000 by her husband in settlement of his marital obligations. The complainant insists that she was an ignorant country girl when she came to Memphis, probably about nineteen or twenty, but she had been married, secured a divorce and settlement with her husband. Her deposition was taken the 13th of December, 1929. She testified that she was thirty-three years of age which would make her twenty-six or twenty-seven years of age at the time she executed the trust deed. She testified that she is the mother of a child, a son who is fifteen years of age, which would fix his birth during the year 1914. The complainant had evidently married the first time nine or ten years before the transaction involved in this law suit took place. She had been engaged in helping to operate various beauty parlors after coming to Memphis. In her cross-examination in relating her relations with Woods, she testified as follows:

So then your claim is that the relations between you and Mr. Woods were intimate?

Yes.

That you sustained immoral relations with him?

I did, if you call being intimate with him immoral, in the sense that you use the word.

And that on that account he gave you this place?

He certainly did, but not on account of the immoral relations but because of his love and affection for me as he stated.

She also testified that defendant Haynie would procure as his guest a certain married woman, and Woods would secure complainant's company and that the quartet visited on pleasure or joy rides

various towns in West Tennessee, Mississippi and Arkansas. The record fails to show whether Haynie was a married man or not, but the complainant certainly knew that the defendant Woods was a married man and a man of family.

The complainant to be entitled to the relief sought must establish by the preponderance of evidence that:

(1) That the trust deed and notes were procured by fraud and are invalid as a result of the fraudulent actions of her attorney W. P. Biggs and the defendants Woods and Haynie, or,

(2) She must establish by a preponderance of evidence that the $4,000 paid for the house and lot in this controversy was a gift to her from Eugene Woods for love and affection.

Counsel for the complainant, in his brief and argument, insists as follows:

"If the court will recall complainant's allegations, in her bill, to the effect that defendant Woods is the real culprit behind the scenes and that defendants Haynie and Cocke are only his 'tools' and instrumentalities for the purpose of maintaining a smoke screen for him to hide behind, it will not be difficult for this court to perceive her charges to be wholly true, and that the defendants simply overreached themselves in their efforts to shield defendant Woods, and being so absorbed with this idea in setting up their defenses, they left, as is usually the case in matters of this nature, such a wide breach in their fence, that the Chancellor readily saw it and appreciated that it was just as effective to hang defendants Woods and Cocke with their own ropes . . . of no interest and no knowledge . . . the evidence being overwhelming as to defendant Haynie, as if he accepted complainant's theory, and probably more so, and by so doing certainly and effectively reached the right result and equity in the case, and thereby avoided any finding involving the good name of a departed member of the Bar, as well as placing the decree of the court in an invulnerable position."

Under the well established rules of equity it is not the duty of this Court to weigh the character of the complainant and the defendant Woods, and reach the conclusion that both had been guilty of immorality, and then hold, because both parties, as shown by the record, have been guilty of immoral conduct, by reason of the defendant's misconduct being the greater and complainant's the lesser that complainant should have relief. But there is a maxim in equity as true as holy writ, that he who seeks equity must come into a Court of Equity with clean hands. No party is entitled to enforce an agreement, the consideration of which is based on a violation of chastity, or on any breach of good morals, the violation of chastity, gambling, or the commission of any crime, are all deemed illegal, and no participant therein can get any relief in the

Chancery Court, whether the relief sought is an enforcement of the agreement or a rescission of it. In pari delicto poti or est conditio defendentis.

Gibson's Suits in Chancery (2 Ed.), Sec. 42.

Complainant is certainly in pari delicto with Woods.

In the case of Goodwin v. Hunt, 11 Tenn., 124, 126, the court said:

"If a complainant's cause of action originates in iniquity, although he may have the right, as against his antagonist, the court of Chancery will turn him out without relief, because it will not give its aid to the establishment and enforcement of a right so stained with sin."

In the case of Weakley v. Watkins, 26 Tenn., 356, 357, the court said:

"For instance, no court of Chancery will entertain a bill to cancel an obligation, the consideration of which was a violation of chastity, compounding a felony, the smuggling of goods in violation of the revenue laws, gaming, false swearing, etc., and this for very obvious reasons. The complainant shall not be permitted to charge himself with crime, and obtain relief out of it; and because public policy requires that the execution of all such contracts shall be discouraged, which cannot be more effectually done than by repelling all action upon them in courts of justice."

In the case of Simmons v. Kincaid, 37 Tenn., 449, the court makes this observation on page 453:

"But the defendant insists, that if he can do no more, he can hold the three-sevenths, to which the three complainants who signed the deed, were entitled. This would be so if they were of age at that time, and if it were not for the fact of his complicity in the violation of the law forbidding the compounding of prosecutions for crimes. The whole transaction is thus tainted with illegality, and a court of equity can extend no relief to any party connected with it. The courts will not contaminate their own purity by extending their aid to either party in such transactions, but repel them whenever they present themselves. They must be left to the advantages and disadvantages of the condition in which they have placed themselves."

In the case of Nichols v. Cabe, 40 Tenn., 91, the court said:

"But the defense is not placed upon the merits, but upon a sound and well approved legal rule, which, in cases to which it applies, repels parties from courts of justice and closes the doors against them, no matter how great their wrongs may have been. This is where the party has been guilty of, or con-

templated in the particular matter, some fraudulent, criminal or immoral act, some breach of good morals, or where the act was in violation of some rule of public policy. In such cases the courts will not interpose, but leave the parties without redress, whatever claims they may have upon each other.''

In the case of Mulloy, Admr., v. Young, 29 Tenn., 297, the court said:

''It is very clear that, upon the case made in the bill, were that uncontradicted, the complainant can have no decree. Neither at law nor in equity could the intestate have been heard to assert a right to recover the note, or hold the defendant accountable for the money due thereon, in the face of his own fraudulent delivery to him with the view of defeating the rights of the wife, and the decree of the court. And his personal representative and distributees are alike estopped to do so. The courts will not, as between the parties, take cognizance of such a fraudulent transaction; nor interpose, at the instance of either, for any purpose whatever.''

In the case of Swan v. Castleman, 63 Tenn., 257, the court said, on page 270 of the decision:

''Nor can we see why a party should be repelled as against another who was equally participant in the wrong, and at the same time be allowed to enforce through a court of equity an iniquitous contract, receiving its active aid, as against a party in possession of property, claiming it, however, by a defective title, yet who is free from all fraud or participation in the fraudulent transaction sought to be enforced. May not such a party well ask the court to stay its hand and repel a party from enforcing against him a claim conceived in fraud as to the rights of third parties, and thus say to the party, 'you can reap no advantage by your fraud or iniquity by the aid of a court of equity.' Is not this a fair application of the maxim that 'he who does iniquity shall not have equity,' that is, shall not have the aid of a court of equity in making his iniquity effectual.''

In the case of Cantrell v. Ring, 125 Tenn., 472, the court speaks as follows on page 482:

''This being so, complainant's bill cannot be maintained. It is well settled law that an action will not lie to enforce a contract made in violation of a statute, or of the common law, or which is immoral in its character, or contrary to public policy.''

We find as a fact that the complainant, at the time she received the deed, did not pay the consideration with her money, but the

money was furnished by defendant Haynie, who had procured it through the defendant Woods; Woods and Haynie did not intend that it was to be a gift to the complainant.

We find no fraud in the transaction wherein complainant signed and executed the four notes and the trust deed to secure the $4,000 paid to the grantor William Deeker; none of this sum was ever paid by the complainant. It was an obligation of the complainant's standing against her unsatisfied at the time of the foreclosure of the property involved in this law suit. The complainant seeks to have this Court hold that this transaction was fraudulent and void; this we cannot do under the evidence submitted in this record. If the notes were ever satisfied, the consideration was based on the improper relations of the complainant with the defendant Woods; such a consideration cannot be and shall not be enforced in a Court of Equity.

As to complainant's insistence that the $4,000 was a gift from Eugene Woods, the bill is not predicated upon this insistence, but be that as it may, all of the documental evidence contradicts the complainant as to this insistence.

In the case of Marshall v. Russell, 93 Tenn., 265, the Supreme Court of Tennessee said this:

"The settled rule is that a parol gift of a chattel or chose in action, whether it be a gift inter vivos or causa mortis, does not pass title to the donee without delivery and transfer of possession. The effect of a valid delivery is to place the subject of the gift under the control and dominion of the donee and his title and right of possession by such gift and delivery becomes absolute and irrevocable. MacEwen v. Troost, 1 Sneed, 185.

"It is, therefore, essential to the validity of such a gift that the transaction be fully completed—that nothing essential remains to be done. If left incomplete there exists a locus penitentiae, and what has been may be revoked. An absolute gift, which will divest the donor's title, requires a complete renunciation on his part, and acquisition on the part of the donee of all the title to and interest in the subject of the gift."

This is quoted with approval in the case of Balling v. Trust Company, 110 Tenn., 288, and the court in that case also says:

"In the case of Grover v. Grover, 24 Pick, 261, 35 Am. Dec.. 319, it is said, 'To constitute a donation inter vivos, there must be a gift absolute and irrevocable, without any reference to its taking effect at some future time. The donor must deliver the property, and part with all present and future dominion over it'—citing Dale v. Lincoln, 62 Ill., 22."

"In order to make this gift complete, it must appear ab-

solutely and beyond doubt that the donor intended to part with his dominion over the property. If the intention to give . . . be not clearly made out, it cannot be supported, and if, upon the facts, the matter be enveloped in doubt, that doubt must prevail against the hypothesis of the case." Sheegog v. Perkins, 4 Baxt., 273, 281.

Evidently defendant Woods did not give the complainant $4,000 on August 30, 1922. He had told her the night before that she would have to execute a deed. It is quite clear and reasonable that Woods expected the house and lot conveyed to complainant to stand as security for the $4,000, that Woods helped Haynie to procure, and Woods informed her, by complainant's testimony, Woods told her that she would have to execute a deed of trust. Whether the notes executed by the complainant on August 30, 1922, were held by Woods or by Haynie, it is immaterial as we view this case. They were never paid in a legal way by the complainant, and the only way in which the complainant could be granted relief would be to hold:

(1) That the notes and trust deed were procured by fraud and without consideration; this we cannot do under the facts as established by this record, or,

(2) To hold that Woods gave the complainant the $4,000 or that she satisfied the notes by her immoral relations with Woods; this we will not do, this court being a court of conscience, it cannot and will not grant relief to any complaining party's prayers who comes into this court with unclean hands.

Complainant's misconduct and relations, as admitted by her with defendant Woods, were unchaste and immoral, and these acts she makes the basis or consideration for her receiving the property in controversy. For this illicit love and lustful affection she asked a Court of Equity, a Court of conscience, to cancel and remove the encumbrance she has placed upon her title.

In our opinion we should not grant relief to one seeking equity, who as the complainant comes into Court with unclean hands.

It results that the assignments are sustained, the decree of the Chancellor is reversed, and complainant's bill is dismissed at her costs, execution will issue accordingly.

Heiskell and Senter, JJ., concur.